49 CCPA
**Application of Harold G. PETERING and Harry H. Fall.**

**Patent Appeal No. 6750.**

United States Court of Customs and Patent Appeals.
April 13, 1962.

George T. Johannesen, Kalamazoo, Mich. (Eugene O. Retter, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge JOSEPH R. JACKSON, Retired.

MARTIN, Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office which affirmed the examiner's rejection of claims 1, 2, 4, 5, 7, and 10–12 of appellants' application for a patent on "Isoalloxazines." Eighteen claims stand allowed by the examiner. The application was filed September 7, 1954.

The following appealed claims are representative: [1]

"1. Compounds represented by the formula:

wherein R is an $\omega$-monohydroxyalkyl group containing from two to six carbon atoms inclusive, $R_3$ and $R_4$ are members selected from the group consisting of lower-alkyl, lower-alkoxy, amino and a polymethylene group linked to the aromatic ring to form a carbocyclic ring having six carbon atoms, $R_2$ and $R_5$ are members selected from the group consisting of hydrogen, lower-alkyl, lower-alkoxy and amino, and wherein $R_2$, $R_3$, $R_4$ and $R_5$ when taken together include not more than one amino group.

"2. Compounds represented by the formula:

wherein R is an $\omega$-monohydroxyalkyl group containing from two to six carbon atoms inclusive and $R_3$ and $R_4$ are lower-alkyl.

"10. 6, 7–Dimethyl–9–[β–monohydroxyethyl]–isoalloxazine.

"11. 6, 7–Diethyl–9–[β–monohydroxyethyl]–isoalloxazine.

"12. 6–Ethyl–7–methyl–9–[β–monohydroxyethyl]–isoalloxazine."

Claims 4, 5 and 7 are subgeneric to claim 2. In claim 4, $R_3$ and $R_4$ are methyl, $CH_3$. In claim 5, $R_3$ and $R_4$ are ethyl, $C_2H_5$. In claim 7, R is $-CH_2CH_2OH$. Otherwise, claims 4, 5 and 7 are identical with claim 2.[2]

The allowed product claims are subgeneric to claim 1 in that $R_2$ and $R_5$ are

---

1. The position numbers 5–9 within the rings of the structural formula in claim 1 are not in the original claim and have been added here to facilitate discussion.

2. In Webster's New International Dictionary, 2d Ed. (1949), it is stated: "omega * * * 4. * * * b. *Chem.* As a prefix, to denote that an atom or

678

hydrogen while at least one of the $R_3$ and $R_4$ groups is amino or alkoxy. Certain claims to a process of producing the claimed compounds have also been allowed.

The reference relied on by the examiner and the board is:

Karrer 2,155,555 April 25, 1939.

As the claims indicate, this application relates to a group of isoalloxazines and to a method of preparing them. The issue is whether the subject matter of the appealed claims is patentable in view of the Karrer patent.

The only relevant part of the application concerning utility of the claimed compounds is as follows:[3]

"These new and novel compounds possess antimetabolite activity; for example, they are competitively active riboflavin antagonists."

The Karrer patent is entitled "Iso-Alloxazine Derivatives and Process for the Manufacture of Same." The Karrer process is not the same as appellants'

process. Karrer's isoalloxazines are expressed by the following generic formula:

"

wherein X, Y, Z, P and R′ represent either hydrogen or alkyl radicals, R a side chain containing an OH group * * *".

Karrer discloses that R may be "for instance $-CH_2OH$, $-CH_2CH_2OH$, $-CH_2CH(OH)CH_2OH$, $-CH_2CH(OH)-CH(OH)-CH(OH)CH_2OH$, or $-CH_2(CHOH)_4-CH_2OH$." Also disclosed are eight specific isoalloxazines all encompassed by the generic formula. We tabulate these as follows:

| X | Y | Z | P | R′ | R |
|---|---|---|---|----|---|
| H | H | H | H | H | $-CH_2CH(OH)CH_2OH$ |
| H | CH$_3$ | CH$_3$ | H | H | $-CH_2CH(OH)CH_2OH$ |
| H | H | H | H | H | $-CH_2CH_2OH$ |
| H | H | H | H | H | $-CH_2(CHOH)_3CH_2OH$ |
| H | CH$_3$ | CH$_3$ | H | H | $-CH_2(CHOH)_3CH_2OH$ |
| H | CH$_3$ | H | H | H | $-CH_2(CHOH)_4CH_2OH_4$ |
| H | CH$_3$ | CH$_3$ | H | H | $-d,l'$-ribityl [5] |
| H | CH$_3$ | H | H | H | $-d,l'$-ribityl |

group is united with the end carbon atom in a chain, as in ⍵-chloro-styrene, $C_6H_5CH=CHCl$" Accordingly, it appears that the –OH or hydroxy grouping in an "⍵-monohydroxyalkyl group" is attached to the carbon atom of the group furthest from the point of ring attachment as in claim 7. Also, "β-monohydroxyethyl" appears to be a species of "⍵-monohydroxyalkyl," and is descriptive of the $-CH_2CH_2OH$ group in claim 7.

3. The utility of the compounds claimed herein appears to be the same as that

of the compound claimed in In re Lambooy, 49 CCPA, 300 F.2d 950, decided concurrently herewith.

4. This group appears to be designated "d-sorbityl" by Karrer.

5. According to Karrer, "Organic Chemistry," 3rd English Ed., p. 331 and pp. 713–714 (1947), this group appears to have the formula $-CH_2(CHOH)_3CH_2OH$, is derived from d-ribose, and is isomeric with the other two R groups of this formula in our table, the latter apparently having been derived from d-arabinose.

There are three portions of the Karrer patent which relate to utility. First, shortly after setting forth his generic formula, supra, Karrer states:

"* * * Neither alloxazine and its derivatives substituted in the benzene ring, nor N-methyliso-alloxazine possess any vitamin action, whereas the new compounds very decidedly influence the growth."

Second, regarding the last compound in our table, supra, Karrer states:

"* * * In the biological test it has the same influence on the growth as vitamin $B_2$ (lactoflavine)."

Finally, the two claims of Karrer are pertinent with regard to utility and are as follows:

"1. The 7–methyl–9–[d,l'–rib-ityl]–iso–alloxazine, the new compound crystallizing in yellow needles melting at 275° C., dissolving in water with yellow colouring and having an influence on the weight increase of test animals characteristic for vitamin $B_2$.

"2. The compounds of the formula

wherein Y is an alkyl radical, $R_1$ is selected from the group consisting of hydrogen and alkyl radicals, and R is a hydroxylated side chain, the compounds dissolving in water with yellow coloring, being very sensitive to light and having an influence upon the weight increase of test animals chacteristic of vitamin $B_2$."

The examiner rejected the appealed claims "as lacking invention over Karrer who discloses generically the claimed compounds and sets forth specifically a homolog."[6] The examiner considered the third compound in our table supra, to be a "homolog of the claims," and stated:

"* * * Applicants have failed to submit a verified affidavit as required by the Examiner showing unusual or unforeseen properties to overcome prior art homologs. * *"

As authority for this requirement, In re Hass et al., 141 F.2d 122, 31 CCPA 895, and In re Henze, 181 F.2d 196, 37 CCPA 1009, were cited. In response to appellants' alleged argument that "the patent teaches that the compounds claimed have utility directly opposite to the compounds instantly claimed and that no showing over the prior art homologs is necessary,[7] the examiner expressed the opinion that the first statement from Karrer that his "new compounds very decidely influence the growth" was broad enough to include retarding growth as well as promoting growth, and that the other pertinent statements in Karrer relate only to specific compounds and not to all of the compounds encompassed by the Karrer disclosure. The examiner stated:[8]

"* * * The choosing of certain compounds falling within the sphere taught by Karrer and determining that these compounds have antimetabolite activity i. e. prevent growth is not invention. It represents that which is taught by Karrer when he disclosed that his compounds influence the growth."

The board affirmed the examiner's rejection generally. In response to appellants' argument that the Karrer general formula is broad and that many choices must be made to arrive at appellants' compounds, the board related Karrer's specific examples to his generic formula, supra, and came to the conclusion that the "formula is not as broad and the range of selection not as great as appellants would make it appear." Relative to the issue between appellants and the examiner as to the differences in prop-

6. Examiner's answer.

7. Ibid.

8. Ibid.

erties between Karrer's compounds and appellants' compounds, the board stated:

" * * * It is not clear that Karrer intends the possession of vitamin activity to refer to all compounds of the class or all those disclosed since the statement is explicitly made only with respect to some of them but we are not convinced that the ascertainment of the property referred to could make such obvious compounds unobvious as compounds."

Appellants urge that the Patent Office has "clearly erred in holding the claimed compounds to be obvious and unpatentable" and asks that we reverse "their action in so doing."

First we will consider the statements of Karrer relating to the properties of the compounds disclosed in his patent. It is noted that the board expressed doubt on this issue. It is our opinion that *no* portion of that patent teaches *any* relevant property for *any* of those compounds, specific or generic, other than, in the words of the ·examiner, a "positive vitamin like activity." *In view of this record*, we do not believe Karrer teaches one skilled in this art that any compound encompassed by his disclosure has or might have a *negative* influence on growth. It may be that the phrase in Karrer, "the new compounds very decidedly influence the growth," when taken out of context, includes both a positive and a negative influence on growth, but this phrase occurs in the same sentence, as set forth supra, with a reference to "any vitamin action." We are unable to accept the suggestion that "any vitamin action" includes an antivitamin action. In our opinion, Karrer contemplated and was discussing only a *positive* "vitamin action" and indeed only a positive vitamin $B_2$ action when he stated that his "new compounds very decidedly influence the growth."

The solicitor urges us to consider the following dictionary definition of "antimetabolite": [9]

"Antimetabolite: A substance having a molecular structure similar to but a pharmacologic effect antagonistic to a metabolite (i. e. a vitamin or a hormone). The mechanism of antagonism is considered to be a competition between antimetabolite for a specific protein in an organism."

The solicitor states:

"This definition would suggest to skilled workers in the art that one or more compounds coming within the general formula of Karrer, such as one of the compounds produced in his specific examples, or one differing slightly therefrom, would act as antimetabolites."

First, we again point out that we believe Karrer intended to include and did include *all* of his compounds, specific and generic, when he stated, "the new compounds very decidedly influence the growth." Second, there is no evidence whatever in the record other than in appellants' own specification that any compound "coming within the general formula of Karrer" is known to act or would obviously act as an antimetabolite. Finally, it is our opinion that any suggestion which this definition might make to one skilled in this art is not sufficiently definite to be of significance in this case. The definition is broad and general, is not expressly applicable to all vitamins, and particularly does not point out what type or degree of structural similarity must exist between compounds with riboflavin activity and those with anti-riboflavin activity. There are many ways in which compounds may differ "slightly" in structure. For example, a chemist could vary the size of one or more rings in Karrer's compounds and still have a "molecular structure similar

---

9. The definition is copied from the solicitor's brief and is said by him to be found in "Blakiston's Pocket Medical Dictionary, Ed. 1, 1952, Blakiston Company, New York."

to" that of Karrer's compounds. Would this change produce a riboflavin antagonist? The record does not tell us. Further, a chemist could replace alkyl groups with halogen, replace oxygen with sulfur, replace carbon with nitrogen, or make any of a myriad of other slight changes and still have a compound with a "molecular structure similar to" the structures disclosed by Karrer.

At oral argument, the solicitor also urged that we take judicial notice of a reference entitled "A Study of Antimetabolites" by D. W. Woolley, and attempted to qualify this author as "one of the recognized authorities if not the foremost authority in the country on the subject." This reference is not in the record and we are reluctant to take notice of it since apparently it is a monograph in a highly technical area of biochemistry. It may be that D. W. Woolley does have the qualifications assigned him by the solicitor but, for all we know, others of equal reputation may have divergent viewpoints in this same area. Such a reference should have been the subject of a discussion between appellants and the experts in the Patent Office and we do not consider it appropriate for us to attempt to evaluate this reference without the benefit of such discussion.

Next we consider the legal effect of the generic and specific descriptions of isoalloxazine structures in the Karrer patent. The generic formula of Karrer, "wherein X, Y, Z, P and R' represent either hydrogen or alkyl radicals, R a side chain containing an OH group," encompasses a vast number and perhaps even an infinite number of compounds since there is no express limit on the size of the alkyl group or the structure and size of R. Even though appellants' claimed compounds are encompassed by this broad generic disclosure, we do not think this disclosure by itself *describes* appellants' invention, as defined by them

in any of the appealed claims, within the meaning of 35 U.S.C. § 102(b). However, there is more than this broad generic disclosure in Karrer. As set forth supra, Karrer discloses certain specific preferences for X, Y, Z, P, R and R' through his series of preferred R groups and his eight specific isoalloxazines. Keeping in mind that the Karrer patent is a publication addressed to those of ordinary skill in this art, it is our opinion that the pattern of Karrer's specific preferences in connection with his generic formula constitutes a description of a definite and limited class of compounds which may be defined with reference to the Karrer generic formula as follows: where X, P and R' are hydrogen, where Y and Z may be hydrogen or methyl, and where R is a member selected from the group consisting of $-CH_2OH$,[10] $-CH_2CH(OH)CH_2OH$, $-CH_2CH_2OH$ $-CH_2(CHOH)_3CH_2OH$ and $-CH_2(CHOH)_4CH_2OH$.

We think the Karrer patent, as a printed publication, *describes* to one skilled in this art not only the broad class but also this much more limited class within that broad class, and we think it is immaterial that Karrer did not expressly spell out the limited class as we have done here. It is our opinion that one skilled in this art would, on reading the Karrer patent, at once envisage *each member* of this limited class, even though this skilled person might not at once define in his mind the formal boundaries of the class as we have done here.

A simple calculation will show that, excluding isomerism within certain of the R groups,[11] the limited class we find in Karrer contains only 20 compounds. However, we wish to point out that it is not the mere number of compounds in this limited class which is significant here but, rather, the total circumstances involved, including such factors as the limited number of variations for R, only two alternatives for Y and Z, no alterna-

---

10. Karrer does not disclose a specific compound with this group at the 9-position but does recite it as a specific example of R.

11. See footnote 5.

tives for the other ring positions, and a large unchanging parent structural nucleus. *With these circumstances in mind*, it is our opinion that Karrer has described to those with ordinary skill in this art each of the various premutations here involved as fully as if he had drawn each structural formula or had written each name. Although isomerism within certain of the R groups will increase the total number of compounds in this limited class, in our opinion, this fact is immaterial *in this case* because we think that one with ordinary skill in this art, with the 20 Karrer compounds before him, would also have before him those subspecies which involve standard well known isomerism within an R group. For these reasons, we hold that each compound within the limited class in Karrer, as defined supra, has been *described* in a printed publication within the meaning of 35 U.S.C. § 102(b), and that it is of no moment that each compound is not specifically named or shown by structural formula in that publication.

It appears that appellants also recognize this limited class in Karrer but attempt to avoid it, for example, by urging that "Karrer chose hydrogen in these three positions [X, P and R'] for the avowed purpose of producing compounds having vitamin activity." [12] We agree that this probably was Karrer's *intent* but the fact remains that Karrer did disclose this limited class and we consider it immaterial for the purposes of this case why he chose to disclose it.

Turning now to the appealed claims, we note that the 6–, 7– and 9–position groups according to appellants' nomenclature correspond respectively to Karrer's Z, Y and R groups. The compound of claim 10 is one of the 20 compounds in the limited class of compounds we find in Karrer. In the light of our previous discussion of this particular limited class, therefore, the compound recited in claim 10 has been *described* in a prior art printed publication and hence is unpatentable. Generic claims 1, 2, 4 and 7

include the compound of claim 10 and are therefore unpatentable for the same reason. Even though appellants' claimed compounds may exhibit antivitamin activity, a property not disclosed by Karrer, this fact is not significant here because appellants' invention *as defined in these claims* is *described* in the Karrer patent.

In affirming the examiner, the board first stated:

"It is our view that they [the claimed compounds] are obvious in view of Karrer."

However, later in their opinion, the board stated:

" * * * we are not convinced that the ascertainment of the property referred to [antivitamin activity] could make such obvious compounds unobvious as compounds."

■ Both appellants and the solicitor have argued this appeal on the basis of 35 U.S.C. § 103. It is our opinion, however, that Congress did not contemplate various *degrees* of obviousness in section 103. We agree with the board that the antivitamin properties of the compounds defined in claims 1, 2, 4, 7 and 10 cannot make these compounds "unobvious" in view of Karrer, not because these claimed compounds are, in the words of the board, "such obvious compounds," but rather, as we have discussed supra, because Karrer *describes* the compound recited in claim 10, a compound also encompassed by claims 1, 2, 4 and 7. Therefore, the decision of the board, so interpreted, is *affirmed* as to claims 1, 2, 4, 7 and 10.

Next we consider claims 5, 11 and 12. The compounds encompassed by these claims, reciting as all of them do an ethyl group, $C_2H_5$, at the 6–position or ethyl groups at the 6– and 7–positions, are not included in the limited class which we find in Karrer. Therefore, it is our opinion that these compounds have not been *described* by Karrer within the

12. Appellants' brief.

meaning of 35 U.S.C. § 102(b) and we turn to the question of their obviousness under 35 U.S.C. § 103. It is true that the compounds included in these claims are encompassed by Karrer's broad generic class of isoalloxazines but so are many, many other compounds. We do not think that the Karrer patent would lead one of ordinary skill in this art to select and prepare the particular compounds defined in these claims. Although it is also true that some of the specific compounds of Karrer, particularly the third compound in our table, supra, are structurally rather similar to the compounds defined in claims 5, 11 and 12, we have found as discussed supra, that there is a significant difference in properties between appellants' compounds and Karrer's compounds. It is this same difference which we found between the claimed compound and the prior art compound in In re Lambooy [13] and the following statement from that opinion is also applicable here:

> "There is no evidence *in the record* which would lead one skilled in this art to expect that the differences in molecular structure between riboflavin and appellant's compound would cause this difference in properties. The former compound is a vitamin, the latter an antivitamin; the former is a metabolite, the latter an antimetabolite; the former acts to promote the well-being of the animal, the latter acts to its detriment. We find it difficult to conceive of a better example of a difference *in kind* than is presented in this case and we also find *in view of this record* that this difference was unexpected and unobvious."

As in Lambooy, there is no evidence in the record of the instant case which would teach one of ordinary skill in this art that the differences in molecular structure between Karrer's specific compounds and the compounds of claims 5, 11 and 12 would cause this difference in properties. Indeed, the *similarities* in molecular structure between the claimed compounds and the prior art compounds here would lead one skilled in this art to assume or predict that *both* groups of compounds would have the *same* properties, i. e., riboflavin activity, rather than antithetical properties. In re Henze, supra. For this reason, we think Karrer leads one away rather than toward compounds with antimetabolic properties.

 We do not agree with the board that the unexpected properties of the compounds defined in claims 5, 11 and 12 should not be considered in determining the patentability of these claims. The compounds are not *described* in Karrer within the meaning of 35 U.S.C. § 102(b). In determining whether the claimed compounds are *obvious* within the meaning of 35 U.S.C. § 103, we think their properties may and should be considered, and having considered the properties, we are convinced the compounds defined in claims 5, 11 and 12 are patentable over Karrer. For these reasons, we reverse the decision of the board as to claims 5, 11 and 12.

In summary the decision of the board is affirmed as to claims 1, 2, 4, 7 and 10 and reversed as to claims 5, 11 and 12.

Modified.

13. See footnote 3.