52 CCPA
**Application of George W. LUVISI and Thomas C. Nohejl.**

**Patent Appeal No. 7228.**

United States Court of Customs and Patent Appeals.

March 11, 1965.

Martin, J., dissented.

Richard L. Johnston, Herbert B. Keil, Chicago, Ill., for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 15, 16, 20, 21, 22, 24, 25 and 28 through 36 in application serial No. 789,479, filed January 28, 1959, entitled "Herbicidal Compositions and Method for the Manufacture Thereof." No claim has been allowed.

The invention relates to (1) a process for killing undesired vegetation, (2) a composition employed for this purpose, and (3) a process for preparing the latter. The composition contains two essential ingredients, viz., a phytotoxic 1-alkyl-3-phenyl substituted urea and a hydrated alkali metal borate such as borax, which is the decahydrate of sodium tetraborate.

Claims 15, 24 and 29 are representative and read as follows:

"15. A composition comprising a phytotoxic 1-alkyl-3-phenyl substituted urea which is normally a water insoluble dusty powder and a hydrated alkali metal borate, said composition being in the form of granules in which said substituted urea and said borate are intimately associated, said granules being further characterized by the fact that they contain a minimum of at least 2%

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge Worley, pursuant to provisions of Section 294(d), Title 28, United States Code.

by weight of said substituted urea, that they contain a predominating proportion of said borate, calculated as borax, as compared with said substituted urea, that they are non-packing in spreaders, and are dustless and free-flowing, the weight ratio of said urea to said borate, calculated as its borax equivalent, being within the range of about 1:9 to 1:25.

"24. A process of preparing a granular composition containing a phytotoxic 1-alkyl-3-phenyl substituted urea that is normally a water insoluble dusty powder which comprises granulating a mixture consisting essentially of a hydrated alkali metal borate and said phytotoxic 1-alkyl-3-phenyl substituted urea, said mixture containing at least 2% by weight of said 1-alkyl-3-phenyl urea and a predominating amount of said borate, calculated as borax, with respect to said substituted urea while adding 2% to 8% of water in the granulating process based on the total weight of the ingredients and using a weight ratio of said urea to said borate, calculated as its borax equivalent, within the range of about 1:9 to 1:25.

"29. A method of controlling the growth of noxious vegetation which comprises applying to the ground on which it is grown a growth-inhibiting amount of a granular composition in which the granules contain at least 2% by weight of a phytotoxic 1-alkyl-3-phenyl substituted urea which is normally a water insoluble dusty powder intimately associated with a hydrated alkali metal borate which is present in said granules in a predominating amount by weight, calculated as borax, as compared with said substituted urea, said composition as applied being dustless, free-flowing and free from quantities of oil which would cause it to pack in a spreader, and the amount of said borate being sufficient to enhance the residual phytotoxicity of said composition, the weight ratio of said urea to said borate, calculated as its borax equivalent, being within the range of about 1:9 to 1:25."

Each claim requires that the weight ratio of urea to borate be within the range of about 1:9 to 1:25.[1] Claims 16, 21, 30, and 32 through 36 specify that the substituted urea is 3-p-chlorophenyl-1, 1-dimethyl urea (hereinafter referred to by its trade name "CMU"). Claims 32 through 36 specify that the borate is borax, with claims 34 and 35 further specifying that a water-soluble binder is present.

In their brief, appellants acknowledge that phytotoxic 1-alkyl-3-phenyl substituted ureas are "well known compounds and are disclosed in a number of United States patents as set forth in appellant-applicants' specification * * *." The brief goes on to say:

"These substituted urea compounds are normally water insoluble dusty powders, are very difficult to handle and apply from spreaders, and have poor residual kill properties.

"One of the substantial problems involved in using substituted ureas as herbicides has been their tendency to form dust which often is blown into adjacent areas whereby desirable vegetation is killed as well as undesirable vegetation. The formation of dust and the danger to surrounding vegetation has severely restricted the use of substituted ureas as herbicides. The problem is more

---

1. In the record before us claim 35 does not recite this limitation. However, the amendment of July 28, 1961, in which claims 32 through 36 were substituted for certain other claims being cancelled, says the ratio has been incorporated into *the* claims and both the appellants' and solicitor's briefs state that "Each claim requires that the weight ratio * * * be within the range of about 1:9 to 1:25." We therefore assume that claim 35 is intended to contain this limitation and our decision should be construed accordingly.

severe because these herbicides are not selective but destroy practically all vegetation.

"Alkali metal borates have also been used as weed killers but the amounts required are so large as to make their use impractical and at reasonable levels of application they have no residual killing effect beyond the ordinary growing season."

Appellants' invention allegedly avoids these problems by providing a composition which (1) can be formed into granules which are dustless, free-flowing, and nonpacking and (2) has a residual killing action beyond the ordinary growing season.

The sole ground of rejection is unpatentability over the following references:

> Knight 2,700,604 Jan. 25, 1955
> Ryker et al. 2,709,648 May 31, 1955
>
> Crafts et al., "Toxicity of Arsenic Borax & Chlorates", in "Hilgardia", Dec. 1936, Vol. 10, No. 10, pages 411 and 412
>
> Litzenberger, "Effectiveness of Borax and Sodium Chlorate Borax Combinations for Control of Perennial Weeds", in Montana Agriculture Experiment Station War Circular 2, 1943, nine pages, page 7 particularly relied on.

All of the claims were rejected on Ryker et al. in view of either Knight, Crafts et al., or Litzenberger.

The Ryker et al. patent is directed to the use of substituted ureas as herbicides and more particularly to the *combination* of a herbicidal aryl alkyl urea *with another herbicidally active compound.* Over fifty aryl alkyl ureas, including "CMU", are specifically set forth and it is readily admitted by appellants that this patent could have been included among those cited in their specification to show that the ureas employed in the present invention are old. The patent teaches that "it is characteristic" of the aryl alkyl urea compounds of the class defined therein "to coact with other herbicidally active compounds, both of the hormonal type and contact type herbicidal compounds, to give *synergistic herbicidal results.*" (Emphasis ours.) The term "sodium borates" is included in a list of contact type herbicidal compounds which the authors say can be used. The amount of each component in the composition is said to vary widely (from 1:200 to 200:1) and depends upon a number of factors, including whether "short term or long term control" is desired. A granular composition is shown in Example V.

The Knight patent is directed to the preparation of granular mixtures from salts such as borates and chlorates, both types of salts being water soluble. It discloses a weed-killing composition containing, as the principal ingredients, sodium chlorate and a suitable hydrated borate such as borax in which segregation of these components is prevented. This is effected by heating the components, thereby releasing the water of hydration of the borate to form a solution of the components at their points of contact. When the mixture is cooled, the dissolved solutes resolidify and form a bridge or bond between neighboring particles. Water may be added from an external source as a substitute for or a supplement to the water of hydration of the borate. The presence of the borate substantially eliminates the risk of fire involved in the use of the chlorate and extends "the effectiveness of the mixture by the relatively slow but sustained weed-destroying property of the borate."

The Crafts et al. article discloses a soil sterilizing composition comprising borax and sodium chlorate in which the lowest effective dosage of chlorate is used and enough borax is added to complete the destruction of the vegetation. Besides reducing the fire hazard of the chlorate to a low level, the presence of borax is said to provide "a residual effect that lowers the probability of reinfestation by seedlings."

The Litzenberger publication discloses that various sodium chlorate-borax combinations were found "to be effective for the control of the perennial noxious weeds except white top for at least a two-year period * * *." The author states that borax "continues to remain active after the sodium chlorate loses its toxicity and thus late-appearing shoots are killed as they come to the surface."

The statutory basis for the examiner's rejection is 35 U.S.C. § 103, the solicitor having stated at oral hearing that section 102 of the statute is not involved. The legal issue for our determination thus becomes: are the differences between the subject matter sought to be patented and the prior art of record such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in this art? Applied to the particular subject matter before us, the issue can be stated: would a dustless, free-flowing, nonpacking composition containing from 9 to 25 parts of a hydrated alkali metal borate per part of substituted urea and capable of effecting nearly 100% kill after fourteen months be suggested to a person of ordinary skill with the art of record before him? We think not, particularly in view of the Nohejl Rule 132 affidavit which will be discussed in detail below.

The decision of the board is predicated upon three principal positions with which we do not agree.

### Board Position Number 1

The board found that since borax, a hydrated alkali metal borate, is taught by the secondary references to be a herbicidal compound, it would be obvious to a skilled chemist to employ borax as a herbicidal sodium borate broadly suggested in Ryker et al. Whereas a brief and selective presentation of the teachings of the art of record, such as that outlined above, may cause such a conclusion to appear reasonable, we believe it becomes so only through hindsight reasoning. A more thorough examination of the references persuades us that

such a combination would not have been obvious *at the time the invention was made.*

Ryker et al. contains, for all practical purposes, a "needle-in-the-haystack" type of disclosure with respect to borax. It states, in effect, that if one mixes an aryl alkyl urea of a certain designated formula with *any other* herbicidal agent, a composition giving synergistic herbicidal results will be obtained. The patentees set forth the following list of *other materials* which can be used:

"2,4-dichlorophenoxyacetic acid and its salts, esters, and amides

2,4,5-trichlorophenoxyacetic acid and its salts, esters, and amides

2-methyl-4-chlorophenoxyacetic acid and its salts, esters, and amides

Maleic hydrazide and its herbicidal derivatives

\*　　\*　　\*　　\*　　\*　　\*

Polychlorophenols (3 to 5 chlorine atoms) and their alkaline salts

Sulfamic acid and its salts

Alkaline salts of cyanic acid

Alkaline salts of thiocyanic acid

Mono-, di-, and trichloroacetic acids, their alkaline salts and esters

3,6-endoxohexahydrophthalic acid and its disodium salt

Alkaline salts of arsenous and arsenic acids

Sodium borates

Sodium or calcium cyanamide

Phenyl mercury salts (acetate, oleate, formate, lactate, chloride, phosphate, and the like)

Isopropyl esters of phenyl- and chlorophenyl-carbamic acids

1,2,4-trichlorobenzene

Dinitrophenols (dinitro-o-cresol and dinitro-o-sec-butyl-phenol) and their salts

Boron trifluoride amine complexes"

Nearly all of these entries are generic in nature and together represent a very wide range of chemical types, including

both organic and inorganic. The "preferred" compounds are said to be selected from the group consisting of ammonium sulfamate, alkaline salts of cyanic acid, alkaline salts of thiocyanic acid, dinitrophenols, pentachlorophenates, alkaline salts of trichloroacetic acid, 2,4,5-trichlorophenoxyacetic acid and its salts, esters, and amides, and 2,4-dichlorophenoxyacetic acid and its salts, esters, and amides. Neither the genus "sodium borates" nor any species therein is mentioned. The patent then discloses approximately sixty specific compositions alleged to be illustrative of the invention. None of these compositions contains borax, or any other alkali metal borate.

We therefore conclude that Ryker et al. does not *legally disclose* any particular borate.[2]

We find nothing in the secondary references which would suggest combining a substituted urea such as disclosed by Ryker at al. with borax to solve the problem of how to obtain a granular, free-flowing, dust-free, herbicidal composition having synergistic residual characteristics and at the same time be economically practical for use in very large quantities. The secondary references disclose borax alone and borax in combination with some other component to produce *water soluble* compositions. The second component is, in all instances, completely non-analogous to a substituted urea. Furthermore, Crafts et al. concludes that one such combination, namely, that of borax with arsenic "would find little use." The sole combination which demonstrated any kind of residual kill effect was borax with sodium chlorate. However, in order to obtain the results appellants have achieved by the present invention, this borax-sodium chlorate composition

would have to be applied at an exorbitant rate, so exorbitant as to be completely impractical for uses contemplated by appellants. Litzenberger states that borax is useful for the "more susceptible" perennial weeds after the chlorate component becomes ineffective, but any suggestion that borax alone possesses a residual kill effect on perennial weeds in general, as in this invention, is clearly negated by the Nohejl 132 affidavit. Knight combines borax with other soluble components and is not concerned with the problem of producing a granular material from a water *insoluble*, dusty component such as substituted ureas. He is therefore neither dealing with, nor suggestive of, a solution to the problem which appellants have overcome.

█ With regard to the art of record in this case, we believe the following excerpt from the opinion of the Patent Office Board of Appeals in Ex parte Garvey, 41 USPQ 583, at 584, is very much in point:

"While the invention here claimed in its broader aspect is doubtless embraced within the speculative teachings of the references, we doubt if references which are not directed to the same purpose and do not have the same inventive concept, can be fairly applied in rejecting claims such as those on appeal where anticipation can be found only by making one of a very great number of possible permutations which are covered by the reference disclosures. *The likelihood of producing a composition such as here claimed from a disclosure such as shown by the Dykstra patent would be about the same as the likelihood of discovering the combination of a safe from*

**2.** To be sure, the language "sodium borates" is present and borax is *a* sodium borate. But an expression which *includes* numerous species does not, necessarily, ipso facto "disclose" each and every one of those species. As so aptly stated by appellants, "It is possible for a patent to *include* a wide variety of subject matter but at the same time *not to disclose a particular* subject matter."

(Emphasis ours.) We might add that the reference need not be a patent. Our approach to this question is to ask whether or not it can fairly and reasonably be said that one of ordinary skill in this art through a reading of the *entire* reference has constructive possession of *the thing itself,* as opposed to possession of mere *language* which *embraces* the name of that thing.

*a mere inspection of the dials there-of."* [Emphasis ours.]

■■ Finally in regard to the question of whether or not it would be obvious to combine "CMU" and borax, we note the following passage from the solicitor's brief:

"Further evidence of the obviousness of combining CMU and borax in a herbicidal composition is provided by the examiner's unchallenged statement that 'the use of hydrated borates in the Ryker et al. formulation would be apparent to an ordinary farmer having this teaching before him.' * * * The ordinary farmer is clearly one of *less than* ordinary skill in the herbicide art."

It is our view that what would be obvious to the "ordinary farmer" has no bearing on the issue before us. Section 103 requires that determinations of obviousness be made with respect to a person of a *particular* skill, namely, a person of ordinary skill *in the art* to which the subject matter pertains as of the time the invention was made. The statute does not contemplate *degrees* of skill and, accordingly, evidence of obviousness to those not of ordinary skill is not controlling.[3]

To summarize on the board's first position, while we observe that it is possible to piece together isolated features of appellants' invention taken from the references with the aid of appellants' disclosure, we do not think the invention would have been obvious within the meaning of section 103 in the absence of that disclosure.

### Board Position Number 2

■ A second position taken by the board was that "no criticality is apparent in the claimed ratio of the two conventional herbicidal compounds in view of appellants' original disclosure which teaches that the claimed ratio is merely a preferred ratio * * *." We find nothing in the record to indicate that appellants have ever alleged criticality in this regard. To the contrary, appellants' statement as to why a ratio has been recited is plainly set forth in their amendment of July 28, 1961, as follows:

"At the interview the Examiner seemed to feel that more specific claims would be allowable. Accordingly, it is proposed to amend the present claims by reciting a ratio of urea to borate, also by cancelling some claims and adding new claims directed more specifically toward the use of borax. To this end, the ratio originally set forth in claim 19, namely, 1:9 to 1:25, has been incorporated into the claims by amendment."

We see no reason for requiring a showing of "criticality," whatever may have been intended by that term, of a limitation which finds support in the original disclosure, which is added to the claims for purposes of advancing prosecution of the application, and which is never alleged by the applicants to be "critical." If an applicant under these circumstances narrows the scope of his claims, he should be entitled to do so without being required to prove criticality.

### Board Position Number 3

During prosecution, a Rule 132 affidavit was filed by applicant Nohejl which compared the residual kill effect of ten different compositions, some of which represent those disclosed in the art of

---

3. We do not intend to suggest that "opinion" testimony by experts cannot be used. See, for example, E. I. DuPont de Nemours and Co. v. Ladd, 117 U.S.App.D.C. 246, 328 F.2d 547 (1964), 140 USPQ 297, wherein expert testimony was successfully employed to refute the contention that tetracyanoethylene was disclosed or "described," within the meaning of section 102, to a person having ordinary skill in the art. The use of such experts to establish "unobviousness" under section 103 is equally appropriate, insofar as they testify to *facts* to show *why* the invention would not be obvious under section 103.

record. Regarding this affidavit, the board, in its original opinion, said:

> "It is our opinion that the Nohejl Rule 132 affidavit does not prove that the claimed ratio critically distinguishes the claims over the applied references."

In its opinion upon reconsideration, the board said:

> "Petitioners call attention to the Nohejl Rule 132 affidavit. We are not persuaded that the results of residual kill shown for the ten formulations in the Nohejl Rule 132 affidavit prove that the claimed ratio of herbicidal compounds is unobvious and critically distinguishes the appealed claims over the applied combination of references."

We believe the results of the affidavit not only fail to justify such findings, but instead require us to conclude that appellants' compositions are unobvious *when viewed as a whole*. Assuming, arguendo, that the board did not err in its positions 1 and 2, we would still feel compelled to reverse the board's decision on the strength of the affidavit.

■ This court has frequently stated that *properties* of chemical *compounds* must be considered in determining obviousness. In re Lambooy, 300 F.2d 950, 49 CCPA 985; In re Petering and Fall, 301 F.2d 676, 49 CCPA 993; In re Papesch, 50 CCPA 1084, 315 F.2d 381. More recently, in In re Huellmantel, 324 F.2d 998, 51 CCPA 845, in discussing the just-mentioned principle, we said:

> "We think this also applies to such compositions as we have here, i. e., *admixtures of two or more compounds*. Therefore, the issue of obviousness in this case can be resolved only after considering the differences between the prior art and the claimed compositions chemically *and* in view of their pharmaceutical properties." [First emphasis added.]

Applying the dictate of Huellmantel to the present case, we now ask: what *properties* of the claimed invention have

been shown? The answer requires an examination of the Nohejl Rule 132 affidavit.

This affidavit presents the results, in terms of "Average Percent Kill at 14 Months," of a number of compositions applied to an area "which consisted almost entirely of perennial or biennial weeds and perennial grasses." Several application rates for each composition were employed. A composition within the scope of the claimed invention gave 52.5, 92.5 and 96.5 percent kills at fourteen months when applied at rates of 200, 300 and 400 pounds per acre, respectively. Borax alone showed *no* residual kill at fourteen months when applied at rates of up to two and one-half times that of the claimed invention. "CMU" alone showed only slight residual kill at fourteen months, approximately $\frac{1}{10}$ that of the claimed composition. Appellants contend that synergism is clearly demonstrated here. The solicitor contends that such a finding is within the Ryker et al. teaching. The trouble we find with both these contentions is that each avoids the central issue—the question of section 103 obviousness.

■ We do not accept the notion that every suggestion of synergism in the art coupled with a finding of synergism in the practice of the invention *automatically* compels a conclusion of obviousness. "Synergism" is a very broad term and means "the combined action of two or more agents * * * that is greater than the sum of the action of one of the agents used alone * * *." Webster's Third New International Dictionary (1961). The definition says nothing at all about how much "greater." Hence, a synergistic composition could well be *un*obvious even though "synergism" is suggested in the prior art. For example, the claimed compositions may be *many times more synergistic* than any of the prior art compositions. Again, some prior art compositions may show little synergism and others show considerable synergistic effects, with the net result that predictability is impossible save the fact that a synergistic result *of some kind*

will probably be found. The situation before us is a blend of these two examples, i. e., the prior art compositions display less synergism than the claimed invention and, more importantly, they display such a variation in degree of synergistic effects that predictability is impossible.

This can be shown by referring to three compositions in the affidavit wherein a specifically named Ryker et al. "other compound" was combined with "CMU". In two instances, the ratio of "other compound" to "CMU" was approximately that used by Ryker et al., and in one of these, the composition differed from the claimed composition only in that ammonium sulfamate was substituted for borax. The application rates were either equal to or greater than those used for the claimed composition. Of the nine tests reported (three application rates for each of the three compositions) percent "residual kills" ranged from 0 to 87.5, eight of the nine values being below 55. The 87.5 value pertains to a 2.5:1 sodium trichloroacetate-"CMU" composition applied at an 800 pounds per acre rate. When applied at 600 and 400 pounds per acre, values of ten percent kill and below were obtained after fourteen months![4] With the results of these nine tests before one of ordinary skill, how could values of 52.5, 92.5 and 96.5 be "obvious" for a 10:1 borax-"CMU" composition applied at rates equal to or less than those used for the Ryker compositions?

Results of tests employing borax-chlorate compositions of the type disclosed in the secondary references were also reported but no residual kill was observed at application rates equal to those used in testing the claimed composition.

Finally, compositions consisting of borax and a predominate amount of "CMU" were tested inasmuch as Ryker et al. allegedly "teach" compositions of up to 200 parts substituted urea per part of "other compound" and borax is allegedly "suggested" by the secondary references to be an "obvious" ingredient for herbicidal compositions having residual killing effects. Compared to the claimed compositions, these compositions were only about 1/10 as effective after fourteen months.

■ Thus, the affidavit shows a great lack of uniformity of residual herbicidal effects, even among those "other compounds" specifically set out in the Ryker et al. patent. In view of such highly erratic results, we find it inconceivable that any definite conclusion can be drawn from the cited art's so-called "synergism" teaching other than that it would be of little, if any, value to one attempting to achieve the results obtained by the practice of this invention. The invention appears to us to contribute knowledge to the art which could not have been derived from the combined teachings of the references, namely the unpredictable residual weed control, more than a year after application, even when used at relatively low dosage rates. We therefore hold that the claimed invention is unobvious within the meaning of 35 U.S.C. § 103.

The decision of the board is reversed.

Reversed.

KIRKPATRICK, J., concurs in the result.

MARTIN, Judge (dissenting).

My view of the references differs from that of the majority. Ryker teaches that CMU may be combined with "sodium borates" to give a synergistic weed-killing composition, but does not give a specific example of the two together. I do not agree that the Ryker reference is "a 'needle-in-the-haystack' type of disclosure with respect to *borax*." [Emphasis supplied.] Ryker at least teaches the basic combination of the two compo-

---

4. By way of further explanation these three applications of sodium trichloroacetate-"CMU" placed on each acre of ground the same amount of "CMU" as the 400, 300 and 200 pounds per acre applications of the claimed composition discussed above. However, our position regarding the unpredictability of results shown by the affidavit is not changed by this fact.

nents. We need not look for *borax* to reject most of the claims. Appellants claim "hydrated[1] alkali metal borate" in claims 15, 16, 20, 21, 22, 24, 25, 28, 29, 30 and 31, which to me is satisfied by the "sodium borates" of Ryker. With regard to the claims that specify borax, I see the secondary references confirming the fact that *borax* is a commonly known useful component in bi-component weed-killing compositions. From these references it is clear that borax is extensively used as a herbicide component. Appellants appear to have picked the most common member of the broad class claimed.

Just what search in Ryker were appellants forced to make, such that their finding was out-of-the-way, and therefore patentable? Certainly they did not have to search through the 52 aryl alkyl ureas for a particular urea. The search was done for them since the particular "1,3 substituted urea" they used was commercially available as the herbicide CMU or Telvar (used in the affidavit), a product sold by du Pont, Ryker's assignee. Appellants acknowledge that, but the thrust of their argument is that sodium borates is buried in a list of 18 classes of compounds, and that borax is even more buried within the class. But, since the class "alkali metal borates" is claimed, we need look only for any member of the class, not the particular member borax. The list of the 18 classes is set out on page 8 of the opinion. It is actually two lists, the asterisks separating the first list of "hormonal type" herbicidal compounds from the remaining list of 14 "contact type" herbicidal compounds. We are concerned only with the list of 14 since it is the contact type which is claimed. Of that list of 14,

Ryker gave specific examples of 10.[2] Sodium borates are among the remaining four with no examples. The key factor is that the members of the list are *not* incidental, just *"any other* herbicidal agent[s]," a "list of *other materials* which can be used," as the majority terms them but are a list of the second component of *bi-component mixtures* such as are disclosed in *all* of the examples[3] in Ryker.

Thus, choice of the most common member of the borates, borax, combined with a commercially available aryl alkyl urea would, in my view, lead to patentability over Ryker and the secondary references *only if* the results were *unexpectedly* synergistic.[4] That is not shown by the specification, and I find the affidavit equally unpersuasive. As shown in their affidavit, appellants mix these two components of Ryker *together and get results* somewhat *less* effective than sodium trichloroacetate plus CMU, which Ryker disclosed in an example. Footnote 4 of the majority opinion can be amplified by noting that, excluding inert filler, 120 lbs. per acre of a 2:1 sodium trichloroacetate-Telvar[5] mixture gives an 87.5% kill at 14 months, while it takes 372 lbs. of an 8:1 borax-CMU mixture to give 96.5% kill, and 186 lbs. per acre give only 52.5% kill. The affiant's results with sodium pentachlorophenate-Telvar, another specifically disclosed Ryker composition, are better than the results with 186 lbs. per acre of the borax-Telvar mixture. The conclusion affiant makes is not justified by the data he presented; he states:

" * * * *Composition 1 consisting essentially of borax and CMU* in which the amount of borax was several times greater than the amount

---

1. There can be no difference predicated on the word "hydrated." Appellants' specification acknowledges that borax is a "hydrated compound."

2. Ryker also showed 3 of the 4 in the non-applicable hormonal type, or 13 of 18 total.

3. There are 64 examples, 48 of which show bi-component mixes, the remaining

16 showing 1 or the other component in comparison tests.

4. I take "synergistic" to mean no more than a product greater than the sum of the parts.

5. Telvar is 80% CMU according to appellants' affidavit.

**112**

of CMU *was also superior at all dosages tested* (i. e., 20, 30 and 40 pounds of Telvar per acre) to compositions in which ammonium sulfamate was substituted for the borax, *to compositions in which sodium trichloroacetate was substituted for the borax, to compositions in which sodium pentachlorophenate was substituted for the borax,* to compositions containing less borax than CMU, to compositions containing CMU without borax, and to compositions containing borax without CMU.

" * * * It is also apparent from the foregoing test results that the compositions of the present application *are superior in their effectiveness to compositions disclosed by Ryker et al.,* U.S. 2,709,648." [Emphasis supplied.]

Nor, has there been shown any critical range in the mixture proportions, assuming only comparable effectiveness, which would lead me to conclude that the combination was unobvious. Finally, there is no showing that *borax* is better than *other borates,* such that I could pin a conclusion of unobviousness thereon.

The majority characterizes the affidavit results as showing herbicidal effects as so "highly erratic" that the prior art teaching of synergism in the combination is negated. I cannot agree that the affidavit results negate the Ryker teaching of synergism in the combination.

The effect of the majority opinion seems to me to be that an enabling disclosure goes only so far as the examples. The opinion is so sweeping as to support claims which would not include ratios of components or be limited to borax, which leaves us in effect with the two-component combination of Ryker. I cannot agree that Ryker did not put one of *ordinary* skill in this art in possession of the combination to the extent that what is claimed here is obvious. Neither appellants nor the majority show me that there is any evidence of an *unexpected* result in the combination.